# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **JOHN A. DOE,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 17-2255-DDC** |
| **UNITED STATES OF AMERICA, et al.,** | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

The matter arises out of plaintiff's tort action against Mark Wisner and his employer—the United States.  The Pretrial Order (Doc. 48) explains that plaintiff seeks to recover via three alternative causes of action:

- Negligence (medical malpractice) against all defendants,

- Negligent supervision against defendant United States, and

- Outrage[1] against all defendants.

The government seeks summary judgment against all three claims.  *See* Doc. 49; Doc. 50 at 3.  Plaintiff has filed a Response (Doc. 57) to the government's summary judgment motion.  And the United States has filed a Reply (Doc. 62).  For reasons explained below, the court grants the Motion for Summary Judgment in part and denies it in part.  The United States deserves summary judgment against plaintiff's negligence claim and negligent supervision claim.  But, the

---

[1]       The tort of outrage is also known as intentional infliction of emotional distress (IIED).  *See Nkemakolam v. St. John's Mil. Sch.*, 994 F. Supp. 2d 1193, 1197 (D. Kan. 2014) (Lungstrum, J.) (citing *Valadez v. Emmis Commc'ns*, 229 P.3d 389, 394 (Kan. 2010)).

court denies summary judgment against the outrage claim.  The court explains why below, beginning with the uncontroverted material facts.

## I.      Summary Judgment Facts[2]

The United States is interested in providing medical treatment to patients at Department of Veterans Affairs (VA) medical centers.  Doc. 48 at 3 (Pretrial Order ¶ 2.a.7.).  The VA employed Mark E. Wisner as a Physician Assistant from September 28, 2008 until June 28, 2014.  Doc. 48 at 3 (Pretrial Order ¶ 2.a.1.).  Wisner served as the primary care provider for approximately 750 to 1,000 patients at the VA Medical Center (VAMC) where the VA employed Wisner to provide direct patient care to veterans, including plaintiff.  *See* Doc. 57-4 at 23 (Cline Dep. 225:8–18).

### Veteran Health Administration Directive 1063

Veteran Health Administration (VHA) Directive 1063, titled "Utilization of Physician Assistants (PAs)," was implemented on December 24, 2013; it rescinded and replaced VHA Directive 2004-29.  *See* Doc. 50-2 at 1 (VHA Dir. 1063).  VHA Directive 1063 refers to a quarterly "retrospective review of at least five randomly selected *patient encounter notes*," not a retrospective review of the entire medical record for five randomly selected patients.  *See id.* at 11 (emphasis added).  The Directive was in effect only for one full annual quarter of Wisner's tenure treating patients at the VA.  *See id.* at 1; Doc. 48 at 3 (Pretrial Order ¶¶ 2.a.1.–3.).

---

[2]      Plaintiff supports many statements of fact by citing his factual contentions from the Pretrial Order (Doc. 48).  The United States responds that those statements of fact are uncontroverted "insofar as this is a statement from 'Plaintiff's Contentions' from the Pretrial Order."  *See, e.g.*, Doc. 62 at 6–9.  While the Pretrial Order's inclusion of these contentions is undisputed, the fact of inclusion itself is not material to the issues the government's summary judgment motion presents.  *See also* Doc. 57 at 11 (¶ 30) (presenting a similar dynamic where plaintiff does not controvert that defendant accurately quotes plaintiff's Complaint).  The court ignores immaterial facts, even if undisputed.  Fed. R. Civ. P. 56(a).

### Oversight of Wisner

As a physician assistant at the Leavenworth VAMC, Wisner practiced under the supervision of various physicians.  Doc. 48 at 5 (Pretrial Order ¶ 2.a.22.).  As a physician's assistant, Wisner only was able to provide medical care to plaintiff and other veterans under the supervision of VA physicians.  From 2010 to the end of Wisner's employment by the VA, Dr. Daniel Cline served as Wisner's supervising physician and first-line supervisor.  Doc. 57-4 at 27 (Cline Dep. 239:8–12).  Supervising Wisner was within Dr. Cline's scope of employment.  *Id.* at 31 (Cline Dep. 246:22–25).

Under VHA Directive 1063, Wisner's collaborating physicians, including Dr. Cline, were responsible for providing clinical oversight, consultation, and patient care management assistance to Wisner.  Doc. 48 at 5 (Pretrial Order ¶ 2.a.24.).  VHA Directive 1063 also made collaborating physicians responsible for monitoring Wisner's clinical activities to ensure they were within the authorized scope of practice.  *Id.* (Pretrial Order ¶ 2.a.25.).  And the directive made the Chief of Service in Wisner's chain of command at the VA responsible for taking action to correct any discovered deficiencies in Wisner's clinical practice.  *Id.* (Pretrial Order ¶ 2.a.26.).

The VA employed Wisner to, in part, conduct physical examinations of patients which may have included sensitive or "intimate" or "uncomfortable" matters.  *Id.* at 3–4 (Pretrial Order ¶¶ 2.a.8.–9.).  The United States neither required a supervisor's presence during Wisner's examinations of his patients nor required a chaperone's presence during Wisner's examinations of his male patients.  *Id.* at 4 (Pretrial Order ¶¶ 2.a.10.–11.).

### March 2012 Allegations Against Wisner

In March 2012, Wisner's direct supervisor, Dr. Cline, knew of an allegation that Wisner had performed an inappropriate patient examination.  Doc. 57-4 at 27 (Cline Dep. 239:8–12).

On March 29, 2012, a patient alleged that Wisner had sexually assaulted him during a medical appointment the previous day.  Doc. 48 at 4 (Pretrial Order ¶ 2.a.12.).  That day, VA police and the VA Office of Inspector General (OIG) were made aware of the patient's allegations.  *Id.* (Pretrial Order ¶ 2.a.13.).  But these allegations were investigated and closed as unproven.  *Id.* (Pretrial Order ¶ 2.a.14.).

### Plaintiff's Treatment at the Leavenworth VAMC

Plaintiff sought and received care at the Leavenworth VAMC.  Doc. 48 at 4–5 (Pretrial Order ¶¶ 2.a.15., 23.).  According to his medical records, plaintiff first saw Wisner at the VAMC on December 13, 2011.  Doc. 48 at 6 (Pretrial Order ¶ 2.a.31.).  Plaintiff's medical records identify a total of four visits with Wisner at the VAMC—December 13, 2011; January 24, 2012; June 4, 2012; and May 1, 2014.  Doc. 48 at 6 (Pretrial Order ¶ 2.a.33.).  Wisner's medically documented examinations of plaintiff occurred in a VAMC exam room while the facility was open and operating.  *Id.* (Pretrial Order ¶¶ 2.a.16.–17.).  Wisner's medically documented genital exams were part of his overall physical examinations.  *Id.* (Pretrial Order ¶ 2.a.18.).  At least some portion of the medical care Wisner provided plaintiff was for a valid medical purpose to provide diagnostic care.  *Id.* (Pretrial Order ¶ 2.a.19.).

### Plaintiff's May 1, 2014 VAMC Visit with Wisner

Plaintiff suffers from prostatitis.  Doc. 50-5 at 1.  On May 1, 2014, plaintiff saw Wisner for this condition.  *Id.*  According to plaintiff's medical records, that was the last time plaintiff saw Wisner at the VAMC.  Doc. 48 at 6 (Pretrial Order ¶ 2.a.32.).  Later, plaintiff told VA OIG Special Agent Baker that Wisner's genital exam was an "unusual exam based on his past exams for prostatitis symptoms."  Doc. 50-5 at 2.  Plaintiff told Special Agent Baker that Wisner's rectal examination was "HIGHLY unusual" and involved "much deeper" penetration (than his

previous exams) twice by an object for 20 to 30 seconds.  *Id.*; *see also* Doc. 57-21 at 2–14 (plaintiff's testimony describing Wisner's May 1, 2014 acts and detailing how those acts differed from plaintiff's previous rectal exams and prostate treatment).

Plaintiff told Special Agent Baker that he asked Wisner "WHAT THE F[ ] WAS THAT?" after Wisner's actions.  Doc. 50-5 at 2.  Plaintiff reported that, "Wisner may have been washing his genitals in the sink" after he had stopped touching plaintiff.  *Id.*  Plaintiff told Special Agent Baker that when Wisner escorted him out of the examination room, he "contemplated striking [Wisner] but recognized that this would be a felony."  *Id.*  Based on his interactions with Wisner, plaintiff sought mental health treatment from several people, including someone at the VAMC.  Doc. 48 at 6–7 (Pretrial Order ¶ 2.a.40.).

### Wisner's Departure and Fallout

On May 19, 2014, the VA placed Wisner on Authorized Absence.  Doc. 48 at 3 (Pretrial Order ¶ 2.a.2.).  The VA placed Wisner on administrative leave at the end of May 2014 based on a report of sexual misconduct.  *Id.* (Pretrial Order ¶ 2.a.3.) (citation omitted).  Wisner remained on Administrative Absence until June 28, 2014, when he voluntarily retired from the VA based on his eligibility under laws in effect at that time.  Doc. 50-4 at 10–11 (Baker Dep. 21:22–22:3).

On January 23, 2015, VA Office of Inspector General (OIG) Special Agent Kerry Baker and Lt. Detective Joshua Patzwald of the Leavenworth County, Kansas Sheriff's Office, interviewed Wisner.  *See* Doc. 50-7 at 2.[3]  During this interview, Wisner shared that he crossed the professional line and was excessive in providing purported genital examinations.  *Id.*  Wisner shared that he performed genital "examinations" on his patients where they were not medically

---

[3]     Plaintiff emphasizes the absence of any basis to think Wisner's comments during this interview referred specifically to either plaintiff or Wisner's examination of plaintiff.  *See* Doc. 57 at 5 (¶ 9).  He extends this commentary to many of Wisner's admissions.  *See id.* at 5–8.

indicated or necessary, and that he did so for his own pleasure. *See id.* Wisner acknowledged

that he chose his victims, and that his victims were all attractive and of a similar body type. *See*

*id.* at 3.

Wisner acknowledged he knew that what he was doing to his patients was wrong and that

he lacked self-control. *See id.* Wisner shared that he provided genital examinations to his

patients to satisfy his own curiosity and that all of his behavior was designed simply to satisfy his

curiosity. *See id.* Wisner admitted that he took active steps to avoid getting caught. *Id.*

Specifically, he falsified medical records. *Id.* His acts of falsification included failing to

document multiple genital examinations. *Id.* at 2–4; Doc. 50-8 at 10 (¶ 35).

In February 2015, Wisner entered into a Consent Order with the Kansas State Board of

Healing Arts to Surrender his license to practice medicine. Doc. 48 at 3 (Pretrial Order ¶ 2.a.4.).

In the Consent Order, Wisner admitted that he "used his position as a Physician Assistant at the

Dwight D. Eisenhower VA Medical Center in Leavenworth, Kansas to commit sexual battery

crimes against veteran patients[.]" Doc. 50-8 at 3 (¶ 11). He also admitted that he "repeatedly

sexually assaulted" his patients, "had inappropriate sexual contact" with them, and "made

inappropriate sexual comments" to his patients. *Id.* at 10 (¶ 33).

Wisner faced a criminal sodomy charge based on his actions towards plaintiff on May 1,

2014. Doc. 48 at 6 (Pretrial Order ¶ 2.a.36.). Plaintiff confirmed that he testified at Wisner's

criminal trial. Doc. 50-6 at 5 (Pl.'s Dep. 57:3–7). In August 2017, Wisner was convicted of

multiple criminal charges in the Leavenworth County, Kansas, District Court—including

criminal sodomy, aggravated sexual battery, and sexual battery. Doc. 48 at 3 (Pretrial Order ¶

2.a.5.). Wisner received a prison sentence of 187 months. *Id.* (Pretrial Order ¶ 2.a.5.). He

currently is in custody serving that sentence. *Id.*

On September 8, 2017, the VA's Office of Regional Counsel received a request for representation from Wisner.  *Id.* at 4 (Pretrial Order ¶ 2.a.20.).  On September 27, 2017, the Office of Regional Counsel denied Wisner's request.  *Id.* at 5 (Pretrial Order ¶ 2.a.21.).

### Plaintiff's Legal Action

On April 29, 2016, plaintiff filed an SF-95.  *Id.* at 7 (Pretrial Order ¶ 2.a.41.).  This administrative claim asserts that Wisner's "deviations constituted sexual assault, sexual battery and deviate sexual assault (rape/sodomy)."  *See* Doc. 50-9 at 4; Doc. 48 at 7 (Pretrial Order ¶ 2.b.41.); Doc. 50-6 at 4 (Pl.'s Dep. 56:13–23).  Plaintiff's administrative claim states that on "June 22, 2015, the State of Kansas filed a criminal complaint against Wisner alleging aggravated criminal sodomy with person/animal and victim physically powerless, related to his 1 May 2014 patient encounter with [plaintiff]."  *See* Doc. 50-9 at 5.

On April 17, 2017, the VA denied plaintiff's administrative claim.  Doc. 48 at 7 (Pretrial Order ¶ 2.a.42.).  On May 1, 2017, plaintiff filed this lawsuit.  *Id.* (Pretrial Order ¶ 2.a.43.).  This lawsuit is based on plaintiff's May 1, 2014 visit with Wisner at the VAMC and plaintiff makes no claims in this lawsuit based on any other visits he had with Wisner.  Doc. 48 at 6 (Pretrial Order ¶¶ 2.a.34.–35.).  Plaintiff timely disclosed experts to address the "examination, diagnosis, care, treatment, or evaluation of Plaintiff," but he did not disclose an expert to support his claim of negligence arising from Wisner's treatment of him on May 1, 2014.  Doc. 50-10 (Designations of Pl.'s Expert Witnesses).

## II.   Legal Standard

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  When the

court applies this standard, it views the evidence and draws reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).  When deciding whether the parties have shouldered their summary judgment burdens, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

With this standard in mind, the court considers defendant's summary judgment motion.

## III.    Discussion

Defendant United States argues that it deserves summary judgment against plaintiff's claims.  The government makes three general arguments for summary judgment:  (1) plaintiff's claims fail for lack of supporting expert testimony; (2) the United States has not waived its sovereign immunity for Wisner's actions; and (3) plaintiff's negligent supervision claim fails. *See* Doc. 50 at 1–2.  The court considers each of these arguments and plaintiff's respective counter arguments.  The court first will address whether plaintiff's failure to secure an expert witness supporting his medical malpractice theory of liability dooms his negligence claim.  But before turning to the parties' arguments, the court briefly discusses sovereign immunity and the Federal Tort Claims Act.

### A.    Federal Tort Claims Act (FTCA) Standard

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994).  Congress occasionally waives federal sovereign immunity and consents to suit.  But a "waiver of sovereign immunity must be strictly construed, in terms of its scope, in favor of the sovereign[.]" *Sossamon v. Texas*, 563 U.S. 277, 292 (2011) (citation and internal quotation marks omitted).  And "the party suing the government

bears the burden to prove a waiver of sovereign immunity[.]" *Ohlsen v. United States*, 998 F.3d 1143, 1154 (10th Cir. 2021).

"The Federal Tort Claims Act (FTCA) allows a plaintiff to bring certain state-law tort suits against the Federal Government." *Brownback v. King*, 141 S. Ct. 740, 745 (2021). "Under the FTCA, Congress granted a 'limited waiver of sovereign immunity' by 'making the Federal Government liable to the same extent as a private party for certain torts of federal employees.'" *Ohlsen*, 998 F.3d at 1153 (quoting *United States v. Orleans*, 425 U.S. 807, 813 (1976)). The statute provides that the United States may face liability for injuries "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

"But the FTCA carves out several important exceptions. And when an exception applies, sovereign immunity remains, and federal courts lack jurisdiction." *Ohlsen*, 998 F.3d at 1154 (cleaned up). Our Circuit has explained that "exceptions to the FTCA are to be narrowly construed[.]" *Id.* (cleaned up).

The court now considers whether the United States deserves summary judgment against plaintiff's claims.

### B. Whether Plaintiff's Failure to Support his Medical Malpractice Negligence Claim with Expert Testimony Entitles the United States to Summary Judgment

Defendant asserts that plaintiff's failure to adduce expert testimony to support his medical malpractice negligence claim precludes plaintiff from prevailing on that theory of liability as a matter of law. Doc. 50 at 12–14. The court agrees, and now explains why.

Under Kansas law, a medical malpractice plaintiff must prove:

(1) The health care provider owed the patient a duty of care and was required to meet or exceed a certain standard of care to protect the patient from injury; (2) the provider breached this duty or deviated from the applicable standard of care; (3) the patient was injured; and (4) the injury proximately resulted from the breach of the standard of care.

*Drouhard-Nordhus v. Rosenquist*, 345 P.3d 281, 286 (Kan. 2015).

"The plaintiff in a medical malpractice case bears the burden of showing not only the doctor's negligence, but that the negligence caused the injury." *Hare v. Wendler*, 949 P.2d 1141, 1146 (Kan. 1997) (internal citation omitted). "Except where the lack of reasonable care or the existence of proximate cause is apparent to the average layman from common knowledge or experience, expert testimony is required in medical malpractice cases to establish the accepted standard of care and to prove causation." *Id.* (internal citations omitted). Here, it is uncontroverted. Plaintiff has failed to disclose an expert witness who can provide testimony to support his claim of negligence arising from Wisner's treatment of him on May 1, 2014. *See* Doc. 50-10 (Designations of Pl.'s Expert Witnesses). And his deadline to do so passed long ago. Therefore, plaintiff cannot offer expert testimony about the applicable standard of care or prove causation. For that reason, the United States is entitled to summary judgment against the medical malpractice claim unless (1) the common knowledge exception applies, or (2) some other reason frees plaintiff of the burden to support his claim with expert testimony.

Plaintiff offers arguments to support each alternative. *First*, plaintiff asks the court when analyzing this claim to take judicial notice of its previous rulings, applicable findings of facts, and testimony in related litigation. Doc. 57 at 33. *Second*, plaintiff suggests that defendant's own witnesses obviate the need to support his claim with expert testimony. *Third*, plaintiff

argues that his case qualifies for the common knowledge exception.  *See id.* at 39–40.  The court addresses each argument, in turn.

### 1.   Whether Judicial Notice Relieves Plaintiff from the Requirement to Produce Expert Testimony Supporting His Malpractice Claim

Plaintiff asks the court, when it addresses his claim, to take judicial notice of its previous rulings, applicable findings of facts, and testimony in related litigation.  Doc. 57 at 33.  Specifically, he urges the court to "take judicial notice of its Memorandum and Decision in Case No. 16-CV-2627, 11/20/2020" including Conclusions of Law ¶¶ 36–37.  *Id.* at 36.[4]  In *Leininger*, these conclusions of law supported the court's larger conclusion that plaintiff had established all the elements of that plaintiff's medical malpractice claim.  *See Leininger*, 499 F. Supp. 3d at 994.  In ¶ 36, the court concluded:

> Plaintiff presented evidence by way of expert testimony, establishing the standard of care.  Gloves were always required when conducting genital or rectal examinations under the relevant standard of care.  Genital and rectal examinations were not required at every visit, and they typically should take 30 to 60 seconds.  Wisner, as a PA, had a duty to comply with this standard of care.

*Id.*  And then in ¶ 37, the court concluded:

> Plaintiff presented evidence showing that Wisner breached that standard of care.  Specifically, every time Wisner conducted a genital examination without using gloves, he violated the standard of care.  He also conducted a number of genital examinations that were unnecessary.  Also, each of the genital exams lasted longer than appropriate under the standard of care.

*Id.*  Here, in sum, plaintiff asserts that he doesn't need to produce expert testimony specific to him because another plaintiff who brought a similar claim against the same defendants already has produced that evidence, and the court reached a legal conclusion based on that evidence.

---

[4]     The court issued no Order or Notice in Case No. 16-2627 on November 20, 2020.  The court construes this citation as referring to the court's November 2, 2020 Memorandum of Decision under Rule 52(a) (Doc. 162) in that case.  *See Leininger v. United States*, 499 F. Supp. 3d 973, 994 (D. Kan. 2020).

The United States rejects plaintiff's argument about judicial notice, asserting that plaintiff's "pleas for judicial notice do not reflect a legitimate use of Federal Rule of Evidence 201." Doc. 62 at 27. The government asserts that plaintiff's call for judicial notice suffers two weaknesses. *First*, that the materials plaintiff asks the court to consider "shed no light on Wisner's care and treatment on May 1, 2014 of this specific Plaintiff[.]" *Id.* at 28. *Second*, "there is no support in Plaintiff's Opposition from any case, statute, or Federal Rule [allowing] for the wholesale incorporation of other cases and decisions as a proxy for a different plaintiff's proof." *Id.* The government contrasts (1) the legal conclusions that plaintiff asks the court to take notice of, with (2) materials properly subject to judicial notice—"'certain facts, which from their nature are not properly the subject of testimony, or which are universally regarded as established by common knowledge.'" *Id.* (quoting *Meredith v. Beech Aircraft Corp.*, 18 F.3d 890, 895 (10th Cir. 1994) (citing Fed. R. Evid. 201)).

Plaintiff's arguments fail to persuade the court that earlier conclusions of law about duty and breach taken from a previous medical malpractice trial based on evidence introduced in that trial are facts appropriate for judicial notice here. *See* Fed. R. Evid. 201(a). Our Circuit has reasoned similarly when denying a litigant's attempt to harness judicial notice. *See Meredith*, 18 F.3d at 895 (noting that "recognition of certain facts by the judge is proper without proof because such facts are not subject to reasonable dispute[,]" and concluding that judicial notice would be improper where the fact at issue "is not this kind of universal truth" but rather "a fact that must be established through the presentation of evidence[,]" as well as "disputed by [one party]"). Also, a Kansas court has rejected a plaintiff's analogous argument seeking to invoke state law judicial notice rules to support an element of his medical malpractice claim. *See McEachern v. Morris*, No. 117,253, 421 P.3d 773, 2018 WL 910935, at *9 (Kan. Ct. App. Feb. 16, 2018)

(denying plaintiff's request for judicial notice of facts "not widely known by a layperson within the territorial jurisdiction of the court" because "the [Kansas] judicial notice statute is not intended to establish a key element in a negligence claim, and [plaintiff] does not cite any authority supporting its use in this way").[5]

Judicial notice cannot plug the gaps left by plaintiff's failure to secure expert testimony supporting certain elements of his medical malpractice claim. The court thus rejects this argument and turns to plaintiff's alternative reasons why the state law requirement doesn't apply to his medical malpractice negligence claim—that he can rely on testimony of *defendant's* witnesses, and that the *common knowledge exception* applies to his malpractice claim.

### 2. Whether Plaintiff Need Not Produce Expert Testimony Because Defendant's Witnesses and Experts Testified that Defendant was Negligent

Plaintiff next suggests that no expert witness is required to support his negligence claim because he "does not believe such an expert is unnecessary based upon the facts of this case, including but not limited to Defendant's own testimony." Doc. 57 at 13 (¶ 35) (citing Doc. 57-4 at 30 (Cline Dep. 244:2–24)); *see also* Doc. 57 at 40–41 (citing Doc. 57 at 13 (¶ 37)). Plaintiff cites no authority to support this argument. Moreover, even if plaintiff could rely on defendant's witnesses to show *breach* of the standard of care, plaintiff fails to explain how that testimony can

---

[5]        Plaintiff's call for the court to rely on *Leininger* looks more like an attempt to employ offensive collateral estoppel than it does judicial notice. "Under the doctrine of issue preclusion, a prior judgment forecloses successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment." *Herrera v. Wyoming*, 139 S. Ct. 1686, 1697 (2019) (cleaned up). But plaintiff fails to assert an explicit collateral estoppel theory or explain why he could invoke that theory against the United States. *See United States v. Carter*, 995 F.3d 1222, 1226 (10th Cir. 2021) (citing *United States v. Mendoza*, 464 U.S. 154, 162 (1984) (noting that "nonmutual offensive collateral estoppel simply does not apply against the government in such a way as to preclude relitigation of issues")).

replace expert testimony showing that the breach *caused* plaintiff's injuries. *See id.* The court rejects this argument.

Next, the court considers plaintiff's argument that the common knowledge exception applies here.

### 3.   Whether the Common Knowledge Exception to the Expert Testimony Requirement Applies Here

Plaintiff argues that he need not produce expert testimony to support his negligence claim because an exception to that requirement applies here. Doc. 57 at 39–40. The government disagrees. Doc. 62 at 29–31. The court briefly explains this exception, and then decides whether it applies here.

As already noted, under Kansas law, a "plaintiff in a medical malpractice case bears the burden of showing not only the doctor's negligence, but that the negligence caused the injury." *Hare*, 949 P.2d at 1146 (internal citation omitted). "Except where the lack of reasonable care or the existence of proximate cause is apparent to the average layman from common knowledge or experience, expert testimony is required in medical malpractice cases to establish the accepted standard of care and to prove causation." *Id.* (internal citations omitted). This common knowledge exception applies only when "the lack of reasonable care or the existence of causation is apparent to the average layman from common knowledge or experience." *Watkins v. McAllister*, 59 P.3d 1021, 1023 (Kan. Ct. App. 2002) (citing *Hare*, 949 P.2d at 1146). Whether the exception applies is a question of law for the court to decide. *Perkins v. Susan B. Allen Mem'l Hosp.*, 146 P.3d 1102, 1105 (Kan. Ct. App. 2006). The "application of the common knowledge exception is extremely limited" and, most often, applies to cases where a physician leaves a sponge or surgical instrument inside the patient after surgery. *Munoz v. Clark*, 199 P.3d 1283, 1288 (Kan. Ct. App. 2009); *Schwartz v. Abay*, 995 P.2d 878, 880 (Kan. Ct. App. 1999).

### a. Whether the Common Knowledge Exception Applies Because Breach of the Standard of Care is Apparent to the Lay Juror

Plaintiff asserts that he has adduced evidence showing that Wisner's care was patently bad, making Wisner's deviation from the standard of care apparent to the lay juror without expert involvement. The court disagrees. The summary judgment facts about what happened during plaintiff's VAMC visit with Wisner do *not* make the lack of reasonable care apparent to the average lay juror armed only with common knowledge or experience. Questions about the standard of care for patients presenting with possible prostatitis fall well outside common knowledge. Wisner's May 1, 2014 conduct itself—as the summary judgment facts describe it—is not medical malpractice so obvious that no expert witness is needed. The common knowledge exception doesn't apply cleanly to the *breach* issue here.

Yet plaintiff emphasizes that Wisner was convicted criminally as a "direct result of his May 1, 2014 'prostate exam[.]'" *Id.* at 39–40. The parties stipulate that "Wisner was charged with criminal sodomy as a result of his actions towards Plaintiff on May 1, 2014 and was found guilty of that crime." Doc. 48 at 6 (Pretrial Order. ¶ 2.a.36.) (citing K.J. Dep. 57:8–23 (Nov. 19, 2019)). The court thus considers whether the stipulated fact of Wisner's criminal conviction for criminal sodomy of this plaintiff makes apparent Wisner's breach of the standard of care for purposes of the common knowledge exception, or otherwise discharges plaintiff's burden to produce expert testimony showing breach.

Under Kansas law, "sodomy" includes, among other things, "anal penetration, however slight, of a male or female by any body part or object[.]" Kan. Stat. Ann. § 21-5501(b). But the statutory definition of "sodomy" excludes "penetration of the anal opening by a finger or object in the course of the performance of: (1) Generally recognized health care practices[.]" Kan. Stat. Ann. § 21-5501(b)(1). So, plaintiff has adduced evidence capable of establishing that

Wisner, based on his treatment of plaintiff on May 1, 2014, was convicted of criminal sodomy involving "sodomy" other than penetration of the anal opening by a finger or object in the course of the performance of generally recognized health care practices.  Assuming "[g]enerally recognized health care practices" include practices comprising the standard of care relevant here, the fact of Wisner's conviction based on his treatment of plaintiff (viewed in the light most favorable to plaintiff, as non-movant) suggests that Wisner's treatment of plaintiff breached the standard of care—whatever that standard might be.

Plaintiff asserts that this means the *common knowledge exception* spares him from the burden to submit expert testimony to establish breach of the standard of care.  The court construes plaintiff's argument to assert that the parties' Pretrial Order stipulates facts that, viewed in the non-movant plaintiff's favor, establish Wisner's actions on May 1, 2014, involved conduct beyond generally recognized health care practices.  Thus, plaintiff argues that Wisner's actions fall outside the standard of care such that plaintiff need not produce an expert witness to show that Wisner's treatment of plaintiff deviated from the standard of care.  This court is not so sure.  Kansas law treats the common knowledge exception as "extremely limited[,]" and the peculiar factual circumstance here differs from cases holding that the exception applies.  *Munoz*, 199 P.3d at 1288.  And plaintiff fails to provide any authority supporting the assertion that violating a criminal statute can support the common knowledge exception.  *See* Doc. 57 at 41–42.  Moreover, even if the court accepts plaintiff's reasoning why that exception spares him the need to secure expert testimony showing breach of the standard of care, a crucial question about causation would remain:  Whether the absence of expert testimony showing Wisner's breach *caused* plaintiff's harms precludes plaintiff's medical malpractice claims.  The next subsection tackles that question.

### b. Whether the Common Knowledge Exception Applies Because Causation is Apparent to the Lay Juror

Plaintiff argues that this case triggers the common law exception allowing him to show causation without expert testimony. Doc. 57 at 39. He asserts that a fact finder needs no expert witness to explain that a medical provider who inserts something into plaintiff's rectum causes that plaintiff pain and distress. *Id.* at 42. He asserts that it "is within the common knowledge and experience of the general public that rape, or criminal sodomy during a medical exam results in injury to the patient." *Id.* The United States rejects plaintiff's application of the common knowledge exception. The government asserts that "[t]reatment and care of the prostate is not within the common knowledge of most fact finders[,]" and an "expert would be able to testify as to the proper care and treatment of Plaintiff's prostatitis that are beyond the scope of knowledge of the typical lay person." Doc. 62 at 30.

Plaintiff's reliance on Wisner's conviction when arguing that plaintiff doesn't need expert testimony to establish breach leaves open questions about causation. *See McEachern*, 2018 WL 910935, at *10 (noting in analogous medical malpractice context that "relying on the statute" to establish negligence per se "does not obviate the need to provide expert medical testimony on the issue of causation"). Plaintiff asserts that the criminal sodomy conviction itself makes causation apparent. Doc. 57 at 42. But plaintiff's method of asserting breach via Wisner's criminal sodomy conviction leaves too undefined which portions of Wisner's treatment of plaintiff were tortious. The stipulated fact of Wisner's conviction establishes that "sodomy" under Kan. Stat. Ann. § 21-5501(b)(1) occurred, and thus the conduct fell outside the statutory medical care exclusion. But even if the parties' stipulations establish a breach of the standard of care, it's unclear which portion of Wisner's examination of plaintiff breached the standard of care. With the breach unknown, the court cannot conclude that the average lay juror would find

it apparent that Wisner's breach proximately caused plaintiff's injuries. The common knowledge exception thus cannot apply to plaintiff's medical malpractice claim. Expert testimony is required, but plaintiff has provided none. This conclusion means that the United States is entitled to summary judgment against the medical malpractice claim.

### C.    Whether Plaintiff's Failure to Support his Medical Malpractice Claim with Expert Testimony Forecloses His Vicarious Liability Claim Based on Wisner's Malpractice

Next, the court considers whether concluding that defendant deserves summary judgment against plaintiff's medical malpractice claim resolves any of plaintiff's other claims. Defendant argues that "because all of Plaintiff's remaining claims stem from Wisner's actions during a May 1, 2014 visit with Plaintiff, they too fail for lack of expert proof." Doc. 50 at 1.

Plaintiff brings several claims against the United States, alleging both vicarious and direct liability. *See* Doc. 48 at 27–29 (Pretrial Order ¶ 4.a.). Plaintiff asserts that the government is vicariously liable for, among other things, Wisner's negligent acts. *Id.* But vicarious liability requires an underlying tort. *See Bair v. Peck*, 811 P.2d 1176, 1178, Syl. ¶¶ 2–3 (Kan. 1991). Here, plaintiff cannot rest his vicarious liability claim on Wisner's negligence when, for reasons the court has discussed in preceding pages, the law precludes that underlying negligence claim. The United States thus deserves summary judgment against plaintiff's vicarious liability claim based on Wisner's negligence.

The court thus turns to plaintiff's alternative claims against the United States: Outrage and vicarious liability based on Wisner's acts constituting outrage, and negligent supervision of Wisner. *See id.* at 28–29. This analysis begins with the negligent supervision claim.

D.     **Whether the United States Deserves Summary Judgment Against Plaintiff's Negligent Supervision Claim**

The parties dispute whether the FTCA's discretionary function exception applies to plaintiff's negligent supervision claim. "The discretionary-function exception to the FTCA excludes the government from liability for '[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.'" *Ohlsen*, 998 F.3d at 1160 (quoting 28 U.S.C. § 2680(a)). "This discretionary function exception poses a jurisdictional prerequisite to suit, which the plaintiff must ultimately meet as part of his overall burden to establish subject matter jurisdiction." *Id.* (citation and internal quotation marks omitted).

Here, the parties agree that *Berkovitz v. United States*, 486 U.S. 531 (1988) governs the question. In *Berkovitz*, "the Supreme Court announced a two-part test for determining whether a challenged action falls within the scope of the discretionary function exception." *Sydnes v. United States*, 523 F.3d 1179, 1183 (10th Cir. 2008) (Gorsuch, J.). "At the first stage, a court must consider whether the action is a matter of choice for the acting employee. If the action does involve such choice, [the court] must then consider whether the type of action at issue is susceptible to policy analysis." *Id.* "If both of these conditions are met, the discretionary function exception applies and [the] sovereign immunity doctrine precludes suit. If, however, plaintiffs can show that *either* prong is not met, then the exception does not apply and a claim may proceed." *Id.*

### 1.   Whether the Action is a Matter of Choice for the Acting Employee

The parties agree that a federal law, regulation, or policy mandated certain conduct here. *See* Doc. 57 at 59–61 (Pl.'s Resp.) (discussing VHA Dir. 1063); Doc. 62 at 40–42 (Def.'s Reply)

(same).[6]  The parties' discussion of the mandates in VHA Directive 1063 centers on just a few

provisions.  In relevant part, this Directive provides:

> The collaborating physician's oversight responsibilities for this level of PA practice
> include periodic monitoring of the PA's clinical activities through a retrospective
> review of at least five randomly selected patient encounter notes each quarter to
> ensure the presence of ongoing competency and medical appropriateness.   In
> addition, the collaborating physician and PA will be in contact at least weekly to
> discuss any difficult or unusual clinical management issues.

Doc. 50-2 at 11 (¶ 3.a.).  The parties further agree that defendant's employees may have failed to

comply with the directive's non-discretionary requirements.

But disagreement erupts when the question turns to causation.  "To circumvent the

discretionary function exception, the mandatory duty alleged must be one whose breach bears a

causal relationship to the Plaintiffs' injuries, thereby giving rise to their cause of action against

the government."  *See Clark v. United States*, 695 F. App'x 378, 386 (10th Cir. 2017) (citing

*Franklin Sav. Corp. v. United States*, 180 F.3d 1124, 1132–33 (10th Cir. 1999)).  Defendant

asserts that plaintiff fails to show that the government violating VHA Directive 1063 *caused*

plaintiff's alleged harm.  *See* Doc. 50 at 31–36; Doc. 62 at 40, 42.  Plaintiff suggests that

causation is clear, denying any "disconnect between the failures of the VA to follow Directive

[1063] and the injury and harm to Plaintiff."  Doc. 57 at 63.  He reasons that "[b]ased upon the

evidence, and the reasonable inferences that can be drawn from the evidence, the failure of VA

---

[6]      Plaintiff's discussion of Kansas law does not support his arguments about the discretionary
function exception. *See Sydnes v. United States*, 523 F.3d 1179, 1184 (10th Cir. 2008) (Gorsuch, J.) ("To
overcome the discretionary function exception and thus have a chance of establishing a waiver of
sovereign immunity, plaintiffs must show that the federal employee's discretion was limited by a *federal*
statute, regulation, or policy; after all, states can't waive the federal government's immunity." (citation
and internal quotation marks omitted)).  In other cases, our court has rejected similar arguments to invoke
state law to supply the limitation on discretion. *See, e.g.*, *Doe A.I. v. United States*, No. 16-2627, 2020
WL 59861, at *7 (D. Kan. Jan. 6, 2020) ("[P]laintiff argues that the Kansas Physician Assistant Licensure
Act provides non-discretionary duties.  Again, the court already rejected this argument, as the duties must
be federal—not state.").

personnel to properly supervise Mr. Wisner caused the damage to Plaintiff."  *Id.* at 63–64.
Defendant replies that plaintiff "fails to show any facts in the record to support this conclusory
assertion[,]" and argues that plaintiff asks the court to draw improper inferences.  Doc. 62 at 42
& n.12.

The particular causation defect that defendant highlights has precluded other plaintiffs
from overcoming the discretionary function exception.  Related FTCA litigation in our court
stemming from Wisner's conduct has presented a nearly identical legal issue, *i.e.*, whether VA
employees failing to take non-discretionary actions that VHA Directive 1063 prescribes caused
plaintiff-patient's harm sustained from Wisner.  *See Doe A.I. v. United States*, No. 16-2627, 2020
WL 59861, at *6–7 (D. Kan. Jan. 6, 2020) (concluding "there is no genuine issue of material fact
whether the non-discretionary conduct caused plaintiff's harm" and the "first step of *Berkovitz* is
therefore not met").  As our court explained in that case:  "Wisner's supervisor may not have
followed the directives to have weekly contact with Wisner and review five patient encounter
notes quarterly.  But any action taken with respect to problems potentially discovered as a result
was discretionary."  *Id.* at *6 (first citing *Clark*, 695 F. App'x at 386; then citing *Mahon v.
United States*, 742 F.3d 11, 15 (1st Cir. 2014); then citing *Gen. Dynamics Corp. v. United States*,
139 F.3d 1280, 1285–86 (9th Cir. 1998)).  *Doe A.I.* reasoned that "it is improper for plaintiff to
attempt to isolate the non-discretionary duties (which lack direct causation) from the
discretionary duties (for which there is evidence of causation)."  *Id.* (first citing *Johnson v. U.S.,
Dep't of Interior*, 949 F.2d 332, 339 (10th Cir. 1991); then citing *Hardscrabble Ranch, L.L.C. v.
United States*, 840 F.3d 1216, 1222 (10th Cir. 2016)).

The same is true here.  Plaintiff fails to adduce any evidence capable of illuminating a
causal relationship between (1) the breach of the mandatory duty under VHA Directive 1063,

and (2) plaintiff's injuries.  Plaintiff's argument overlooks the discretionary nature of decisions that the government's compliance with VHA Directive 1063 would have produced.  As the United States correctly asserts, plaintiff fails "to identify any federal statute, regulation, or policy dictating a specific course of action to be taken upon discovering deficiencies in Wisner's performance."  Doc. 62 at 43.  Plaintiff cannot bridge the causal gap through speculative inferences based on unspecified evidence.  *Boyer v. Bd. of Cnty. Comm'rs of Cnty. of Johnson Cnty.*, 922 F. Supp. 476, 484 (D. Kan. 1996), *aff'd sub nom. Boyer v. Johnson Cnty. Bd. of Cnty. Comm'rs*, 108 F.3d 1388 (10th Cir. 1997).  Plaintiff asserts that "had VA personnel properly supervised Mr. Wisner—including the required audits of treatment records (including the prescribing of opioid medications) and the required weekly contacts—Plaintiff would not have been subjected to the inappropriate medical care he received."  Doc. 57 at 54.  No reasonable fact finder could adopt that view based on the evidence assembled by the plaintiff.

Plaintiff fails to show that the government conduct was not a matter of choice for the acting employee.  And since the conduct here involved judgment or choice, the court proceeds to the second stage of analysis under *Berkovitz*.

## 2.  Whether the Type of Action at Issue is Susceptible to Policy Analysis

The court considers whether the judgment at issue here is the kind of decision that the discretionary function exception is meant to shield.  *Sydnes*, 523 F.3d at 1185.  Our court has explained its pattern of holding that "personnel decisions such as employee discipline are the type of policy judgments intended to be addressed by the discretionary function exception."  *Doe A.I.*, 2020 WL 59861, at *7 (citing *Anasazi v. United States*, No. 16-2227, 2017 WL 2264441, at *8 (D. Kan. May 23, 2017)); *see also Sydnes*, 523 F.3d at 1185–86 (noting that the Tenth Circuit has "previously and unqualifiedly held that decisions regarding employment and termination . . .

22

are precisely the types of administrative action the discretionary function exception seeks to shield" (cleaned up)).

Here, the relevant supervisory decisions involve a federal agency's decision about what to do about an employee's possible misconduct. The decisions whether, and how to respond to VHA 1063-induced discoveries about Wisner ultimately are personnel decisions involving employment and employee discipline of a type that fall squarely behind the shield of the discretionary function exception. *See Sydnes*, 523 F.3d at 1186–87. Plaintiff has not discharged his burden to establish otherwise. The discretionary function exception to the FTCA thus bars plaintiff's negligent supervision claim and entitles the United States to summary judgment against this claim.

Finally, this leaves plaintiff's intentional tort claim. The court now turns to that claim and the arguments that the United States has deployed against it.

### E. Whether the United States Deserves Summary Judgment Against Plaintiff's Outrage Claims

The FTCA does not waive the Federal Government's sovereign immunity for claims arising out of various intentional torts. *See* 28 U.S.C. § 2680(h) (exempting from FTCA waiver various claims arising out intentional torts). But if § 2680(h) is the exception to the waiver of immunity, an *exception to the exception* also exists. A federal statute allows a remedy against the United States under the FTCA for damages arising from providing medical services by health care employees of the VA under 38 U.S.C. § 7316(a)(1), (f). *Ingram v. Faruque*, 728 F.3d 1239, 1245–46 (10th Cir. 2013) ("[Section] 2680(h) does not bar application of the FTCA to [intentional] tort claims arising out of the conduct of VA medical personnel within the scope of 38 U.S.C. § 7316(f).") (citation and internal quotation marks omitted). This VA Immunity Statute provides:

> The exception provided in section 2680(h) of title 28 shall not apply to any claim arising out of a negligent or wrongful act or omission of any person described in subsection (a) in furnishing medical care or treatment (including medical care or treatment furnished in the course of a clinical study or investigation) while in the exercise of such person's duties in or for the Administration.

38 U.S.C. § 7316(f).

Our Circuit has explained the rationale behind this statute: "In some instances, State law characterize[d] an act of medical malpractice as an intentional tort, leaving VA medical personnel potentially liable for an action for which the law intends the Government to assume liability." *Franklin v. United States*, 992 F.2d 1492, 1500 (10th Cir. 1993) (quoting H.R. Rep. No. 100-191, 100th Cong., 2d Sess. 19 (1988), *reprinted in* 1988 U.S.C.C.A.N. 432, 450). The plain language of this exception-to-the-exception statute, however, does not confine the statute's waiver to claims of medical battery:

> Although Congress was specifically concerned with medical battery, the remedy available under § 7316(f) is not limited to battery. Instead, by rendering 28 U.S.C. § 2680(h) inapplicable, § 7316(f) allows the United States to be sued for "assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights," . . . . Thus, in the context of VA health care employees providing medical care or treatment, § 7316(f) provides a remedy under the FTCA for claims of intentional torts, including false arrest and false imprisonment.

*Ingram*, 728 F.3d at 1249. To apply, § 7316(f) requires only that VA personnel commit an intentional tort "in furnishing medical care or treatment[.]" 38 U.S.C. § 7316(f). The United States emphasizes that the question whether § 7316(f) applies is distinct from whether the VA personnel was acting within the scope of employment. Doc. 62 at 37–38.

Here, the government asserts, § 7316(f) does not apply to Wisner's conduct because he did not commit the alleged wrongful act while furnishing medical care or treatment. To support this argument, the United States relies on an unpublished Eleventh Circuit opinion: *Knezevich v. Carter*, 805 F. App'x 717 (11th Cir. 2020). *See* Doc. 62 at 39. In *Knezevich*, the plaintiff

brought a defamation claim against his VA doctor because, while discussing a surgical procedure with the plaintiff, the VA doctor yelled into the hallway that the plaintiff was threatening him.  A nurse already had taken plaintiff's vital signs, and the doctor had drawn the shape of an incision on the plaintiff's chest when the doctor's outburst occurred.  The Eleventh Circuit separated the "harm-causing conduct"—the doctor's hallway defamation—from the rest of the medical appointment, noting that the checking of vital signs and drawing the incision's shape were "not what allegedly caused [the plaintiff] harm."  *Knezevich*, 805 F. App'x at 725.

The United States asserts that Wisner committed his "harm-causing conduct" during the context of a medical procedure, but not while furnishing medical care or treatment.  Doc. 62 at 39.  The government reasons that sexually molesting a patient is not "furnishing medical care or treatment[,]" and the harm-causing conduct here was Wisner sexually molesting plaintiff.  So, the VA reasons, its personnel did not engage in harm-causing conduct while furnishing medical care or treatment.  *Id.*  This reasoning cannot secure summary judgment on this case's facts.  In cases asking whether § 7316(f) applies to Wisner's conduct during medical appointments, the court previously has rejected the argument "that 'sexual molestation' can never qualify as 'medical care or treatment.'"  *Leininger*, 499 F. Supp. 3d at 992.

The court previously rejected the government's assertion that *Knezevich* applied to intentional torts arising out of a patient's visit with Wisner.  *See id.*  The court distinguished *Knezevich*, reasoning that the "tort alleged in *Knezevich*—defamation—had a distinct beginning and end and was easily separated from the medical care provided by the doctor.  In contrast, in [*Leininger*], the edges of the boundary separating proper medical care from wrongful conduct are far fuzzier."  *Id.*  The court emphasized that the "lines between what was an intentional tort and

what was not an intentional tort are much more muddled [in *Leininger*] than in *Knezevich*[,]" and thus concluded that "the rationale of *Knezevich* does not apply to" *Leininger*. *Id.*

Here, the government objects to the court's earlier analysis of *Knezevich* in related litigation but argues in any event that the facts here differ from those earlier cases. The United States emphasizes the absence of expert testimony here about (a) whether any of that treatment constituted proper medical care and (b) the location of the line separating medical care from wrongful conduct. *See* Doc. 62 at 39. The United States fails to persuade the court that this absence of expert testimony necessarily forecloses plaintiff's outrage claim.

The parties stipulate that "[a]t least some portions of the medical care Mark E. Wisner provided Plaintiff was for a valid medical purpose in order to provide diagnostic care." Doc. 48 at 4 (Pretrial Order ¶ 2.a.19.). It is undisputed that plaintiff testified previous prostate exams involved a medical professional inserting something in his anus to palpate his prostate. *See* Doc. 57-21 at 4 (Trial Tr. 79). And it is undisputed that plaintiff testified that Wisner inserted something in his anus during the May 1, 2014 visit for treatment of plaintiff's prostate. *Id.* at 3 (Trial Tr. 78).

Given these undisputed summary judgment facts, the lines demarcating furnishment of medical care from harm-causing conduct are harder to identify than the tidy factual scenario presented in *Knezevich*. Even if *Knezevich* correctly approaches the issue whether a wrongful act arises from furnishing medical care, this case's far messier facts—when viewed in the light most favorable to plaintiff—complicate any attempt to apply *Knezevich* to wrongful acts not "easily separable from any medical care provided by the doctor." *See Leininger*, 499 F. Supp. 3d at 992 (distinguishing *Knezevich*). Here, a reasonable fact finder could conclude that the alleged intentional tort arises from Wisner furnishing medical care or treatment.

Our court reached similar conclusions in related litigation when ruling on the government's arguments for summary judgment based on § 7316(f). *See, e.g.*, *Doe S.B. v. United States*, No. 16-2575, 2020 WL 59646, at *4 (D. Kan. Jan. 6, 2020) (holding that the question whether "Wisner's improper actions were not taken in the context of delivering medical care or treatment" under 38 U.S.C. § 7316(f) is "reserved for the court as the trier of fact" because "there remains a gray area around what actions constituted providing medical care and what actions were entirely unnecessary and improper"). Here, too, the court cannot conclude as a matter of law that the United States is immune from plaintiff's outrage claim. The government thus cannot secure summary judgment against that claim. It must proceed to trial.

## IV.    Conclusion

The United States seeks summary judgment against each of plaintiff's claims against it. Plaintiff unsuccessfully struggles to overcome his failure to support his negligence claim for medical malpractice with expert testimony. He cannot establish the underlying tort liability necessary to pursue a vicarious liability theory against the United States based on negligence. The government deserves summary judgment against plaintiff's medical malpractice claims.

The United States also deserves summary judgment against plaintiff's negligent supervision claim. The discretionary function exception applies to that theory of liability. So, the Federal Government has not waived its sovereign immunity against that claim. The court thus lacks subject matter jurisdiction over the negligent supervision claim. The court dismisses the claim for lack of subject matter jurisdiction under 28 U.S.C. § 2680(a).

But the United States cannot secure summary judgment against plaintiff's claim for outrage. A triable issue remains for the finder of fact: Whether Wisner's alleged wrongful act

arises from the furnishing of medical care or treatment for purposes of 38 U.S.C. § 7316(f).

Summary judgment against the intentional tort claim thus is out of reach.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion for

Summary Judgment (Doc. 49) is granted in part and denied in part, consistent with this Order.

**IT IS SO ORDERED.**

**Dated this 17th day of August, 2021, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**